John RUST, Otha Hart, Jerry Bussard, James Wichman, Leslie Bussard, William Durand, Robert Sams, Colin Allen, James Harlow, Terrance Yager, Robert Costello, and Roy Lyman, Plaintiffs,

v.

Harold W. CLARKE, individually and as Director of Nebraska Department of Correctional Services; Gary Grammer, individually and as Assistant Director of Adult Institutions for the Nebraska Department of Correctional Services; Frank X. Hopkins, individually and as Warden of the Nebraska State Penitentiary; Robert Houston, individually and as Deputy Warden of the Nebraska State Penitentiary; Mark Rosenau, individually and as the Protestant Chaplain and the Head of the Religion Department for the Nebraska State Penitentiary; Dean Naylor, individually and as the Major for the Custody Force for the Nebraska State Penitentiary; Mario Peart, individually and as Associate Warden/External Operations for the Nebraska State Penitentiary; Kathleen Taylor, individually and as Food Service Director for the Nebraska State Penitentiary; and Mike Kenney, individually and as Deputy Warden of the Nebraska State Penitentiary, Defendants.

No. 4:CV 92–3107.

United States District Court, D. Nebraska.

April 22, 1994.

David L. Buelt and Daniel L. Rock, Ellick, Jones, Buelt, Blazek & Longo, Omaha, NE, for plaintiffs.

Don Stenberg, Atty. Gen. and Terri M. Weeks, Asst. Atty. Gen., Lincoln, NE, for defendants.

## MEMORANDUM AND ORDER

KOPF, District Judge.

John Rust and other inmates have sued Harold W. Clarke, and other correctional administrators, contending that the Defendants have denied the Plaintiffs the opportunity to freely exercise their religious beliefs (filing 46, second amended complaint ¶ 21). Defendants have filed a motion for summary judgment (filing 65) in essence asserting that (1) the religious rights of the Plaintiffs have not been violated; and, (2) even if the religious rights of the Plaintiffs were violated, the Defendants have Eleventh Amendment and qualified immunity from damages.

As to Defendants' first assertion—that there has been no violation of the Plaintiffs' religious rights—I shall deny the motion for summary judgment, without prejudice to submission of another motion for summary judgment. As to Defendants' second assertion—that even if there was a violation of the Plaintiffs' religious rights, Defendants have immunity from damages—I shall grant the motion for summary judgment.

## I.

Plaintiffs, who are inmates at the Nebraska State Penitentiary (NSP), follow the religion of "Asatru" which, according to Plaintiffs, is an "Icelandic word/term for the ancient religion of the Teutonic people of Northern Europe ... also known as 'Odinism' or 'Troth'." (filing 46, ¶ 17) Plaintiffs seek damages and declaratory and injunctive relief.

I assume, as it is not truly contested, that the Plaintiffs' religious beliefs are generally sincere [1]. Indeed Defendants recognize Asatru and permit inmate adherents to attend Asatru worship services at NSP (filing 67, ex. 1, affidavit of Hopkins ¶¶ 44 and 48; ex. 3, affidavit of Rosenau, ¶¶ 4, 5, and 8.)

The dispute in this case is *not* whether Defendants have altogether prohibited Plaintiffs from pursuing their Asatru beliefs, but rather the dispute centers on the "mechanics" of Defendants' regulation of Plaintiffs' religious practices. The affidavit (filing 76) of one of the plaintiffs, John Rust, particularizes the dispute in the following terms:

(a) the amount of money distributed by defendants to religious groups is unfairly allocated and discriminates against Asatru members in that the monies are distributed on the basis of inmate designation of religious preference rather than on an inmate's actual practice (*id.* ¶¶ 14, 15);

(b) the time allotted by NSP for the practice of Asatru is unfairly limited and discriminates against Asatru members in that Native American religious adherents have three and one-half hours of worship time during the week, with additional time on the weekends, but adherents of Asatru have only two hours (*id.* ¶ 10);

(c) Asatru members are not provided with meat to "sacrifice" (apparently goat meat or horse meat) and are thus unfairly discriminated against in comparison to adherents of Christian faiths, who are allowed Holy Communion, and Native American religious adherents who are allowed to burn sage and sweet grass (*id.* ¶ 13);

(d) Asatru members are required to pick foods from the regular prison menu for meals as opposed to having "sacrificial meats" and nonalcoholic mead and are thus unfairly discriminated against as other believers are permitted to follow special dietary practices, such as Muslims who are allowed to eat a nonpork diet or Christians who are allowed grape juice (*id.* ¶¶ 5, 7);

(e) Asatru members are not permitted to wear special symbols such as a medallion for their particular god or the sun wheel (which looks somewhat like a swastika) and are thus not permitted to freely exercise their religious beliefs (*id.* ¶¶ 11, 12);

---

1. Defendants do question whether certain practices are necessarily a part of the Asatru religion. In the future, Plaintiffs would be well advised to document why Plaintiffs believe a particular practice is part of the Asatru religion, such as by referring to published theology texts or similar objective sources.

(f) Asatru members are not permitted to use objects having religious significance (such as an altar, yew branch, sacred tree, bowl and hammer) and are thus not permitted to freely exercise their religious beliefs (*id.* ¶ 5);

(g) Asatru members are not permitted to form a cultural club and are thus unfairly discriminated against as other believers are allowed to form clubs which advance their religious views, such as Native Americans who are permitted to form the Native American Spiritual Club Association (*id.* ¶ 15); and

(h) some Asatru members are not permitted to attend religious education programs if they are on room restriction or are subject to the death penalty (*id.* ¶¶ 16, 17).

The Defendants have generally set forth their view of the facts in four affidavits (filing 67, Affidavits marked exhibits 1–4). In general Defendants assert that NSP has an active religion program that does not unfairly discriminate, that the resources of the prison are scarce, and that it is the policy of NSP that inmates retain their religious freedoms except to the extent that the practice of such freedoms may interfere with the safety, security, and good order of the prison or the rehabilitation goals of the prison.

In particular the defendants state:

(a) Insofar as the distribution of monies is concerned, Defendants do not dispute they employ the method described by Plaintiffs, but assert the method is not discriminatory as it accords adherents of Asatru 6.9 percent of the budget while Asatru followers comprise only 1.06 percent [2] of the population (referring to ex. 5 attached to one of Plaintiffs' earlier complaints) (filing 16);

(b) Insofar as the time allotted to members of Asatru to hold worship services, the Defendants do not deny that the amount of time accorded the adherents of Asatru to worship is different than other groups, but Defendants assert that the time accorded is adequate and that special worship services have been allowed at least 20 times (filing 67, ex. 1 ¶ 48; ex. 3 ¶ 8);

(c) Insofar as "sacrifice" is concerned, Defendants admit that "state property" (which I take to include such things as food) cannot be sacrificed, but assert that food items purchased by the inmates at the canteen can be sacrificed (*id.*, ex. 1 ¶ 53);

(d) Insofar as "dietary" considerations are at issue, the Defendants assert that after investigation they have concluded that adherents of Asatru have no special dietary prohibitions (filing 67, ex. 3 ¶ 3), and that special requests for foodstuffs have either been accommodated (if a source could be found) or refused in the same manner as other religious believers have been treated (*id.* ex. 2);

(e) Defendants deny that Asatru believers are prohibited from wearing one religious medallion so long as those medallions are purchased or made through proper channels (filing 67, ex. 1 ¶ 52), but admit that Asatru believers are not permitted to wear a "swastika" because that symbol is not a religious symbol and because it is inflammatory (*id.*, ex. 1 ¶ 51, 52) [3];

(f) Defendants admit that Asatru members are not permitted to use the yew branch, sacred tree and apparently other objects because Defendants could not determine that such objects were needed to conduct Asatru worship services (*id.* ex. 3 ¶¶ 6, 7) and because NSP has limited resources, space, and personnel insofar as its ability to accommodate unnecessary prisoner requests is concerned (*id.* ex. 1 ¶ 57);

(g) Defendants admit that members of Asatru are not permitted to form a culture club, but assert that resources are scarce and that other culture clubs were authorized to "fill a

---

2. In one affidavit Defendants assert that adherents of Asatru comprise 2.7 percent of the inmate population (filing 67, ex. 1 ¶ 45).

3. Throughout the affidavits there are ambiguities which result from a lack of a clear statement of what the *specific* factual complaints are, coupled with a lack of clear statement of what the prison *specifically* allows or does not allow. For example, I am uncertain whether the symbol used by Plaintiffs is in fact a swastika or whether it only has some of the characteristics of a swastika. Likewise I am unsure if the prison only prohibits swastikas or whether the prison also prohibits religious symbols that appear similar to swastikas. Counsel are encouraged to confer and provide the court with a clear and specific statement of the facts.

particular cultural void caused by the predominance of western or European culture in American society" and that "the need to learn about European cultures and Asatru is not as great" (*id.*, ex. 1 ¶¶ 11, 20); and

(h) admit that inmates who are in segregation (including those sentenced to death) are not permitted to attend worship services with general population inmates (*id.* ex. 4 ¶ IV.C.2.d.); assert that a large security burden would be placed upon NSP if such inmates were allowed to attend worship services with general population inmates; and further assert that inmates on room restriction are allowed to attend worship services (*id.* ex. 4 ¶ IV.C.2.e.).

## II.

There are two issues presented by Defendants' motion for summary judgment. The first question, which is on the merits, is whether the Defendants violated the Plaintiffs' federal rights to freely practice their religion. The second question is whether, assuming some violation of Plaintiffs' rights, Defendants are nevertheless immune from liability for money damages. I shall address each question separately.

### A.

▮ I shall deny the motion for summary judgment on the merits. I do so for related reasons.

The Plaintiffs have rested their case on the newly enacted Religious Freedom Restoration Act. 42 U.S.C. § 2000bb, *et seq.* (West Supp.1994) (The "Act"). The Act was specifically intended to apply to state prisons (and other institutions of state and federal government) and in the prison context was designed to overrule the Supreme Court's decision in *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). S.Rep. No. 111, 103rd Cong., 1st Sess. 9 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1892, 1898 ("As applied in the prison and jail con-

text, the intent of the act is to restore the traditional protection afforded to prisoners to observe their religions which was weakened by the decision in *O'Lone v. Estate of Shabazz*.") [4]

The Defendants primarily rest their defense on the analytical rationale suggested by *O'Lone*, but Defendants do not address the Act. As the Act would seem to apply to these Defendants (42 U.S.C. § 2000bb–2(1) & (2)), as the Act appears to be retroactive (42 U.S.C. § 2000bb–3(a)), and since the Defendants have not briefed the Act, it would be unwise to address the merits of the motion since the Act seems to substantially undermine the *O'Lone* rationale—the rationale upon which Defendants base their defense. *See Lawson v. Dugger*, 844 F.Supp. 1538 (S.D.Fla.1994); *Allah v. Menei*, 844 F.Supp. 1056 (E.D.Pa.1994).

Moreover, all of the defense affidavits appear to have been drafted without the Act's substantive provisions in mind, particularly ignoring the factual question of whether the Defendants have employed "the least restrictive means of furthering th[e] compelling governmental interest." 42 U.S.C. § 2000bb–1(b). Thus, as a matter of fact Defendants have left a void in their proof.

Therefore, I shall deny the motion for summary judgment on the merits, but without prejudice to a more properly supported and briefed motion.[5]

### B.

I shall grant the motion for summary judgment as to money damages.

▮ Insofar as Defendants are sued in their official capacities, the Plaintiffs have in effect sued the State of Nebraska. The Eleventh Amendment to the Constitution bars suits against the State and its employees in their official capacity unless waived by Congress or the State. *See, e.g., Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S.

---

4. *O'Lone*, among other things, seemed to waterdown the "compelling interest test" that had previously been applied in the Supreme Court's free exercise jurisprudence.

5. I advise the parties that I think this case can and probably should be resolved on cross-motions for summary judgment. I urge the lawyers to meet, draft a stipulated set of specific facts which are directly responsive to the positions of each party, and then submit cross-motions.

 **381**

89, 97–103, 104 S.Ct. 900, 906–909, 79 L.Ed.2d 67 (1984). The State of Nebraska has not waived its immunity. The Act does not appear to have waived the immunity of the states, either. *See* 42 U.S.C. § 2000bb–1(c). While Congress could abrogate the immunity of the states, it must express itself without equivocation, and it has not done so here. *Pennhurst,* 465 U.S. at 99, 104 S.Ct. at 907. Therefore, the Defendants in their official capacities cannot be sued for money.

■ Insofar as the Defendants are sued in their individual capacities, the Supreme Court's decision in *O'Lone* made it impossible on the facts of this case to conclude that the Defendants, if they in fact violated Plaintiffs' rights, violated a federal law that was "sufficiently clear that a reasonable official would understand" that his or her conduct violated federal law. *See, e.g., Anderson v. Creighton,* 483 U.S. 635, 638–39, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982). Thus, since *O'Lone* would have supported the approach taken by Defendants and the legislative overruling of *O'Lone* did not take place until after this suit was filed[6], I am persuaded that the officials here have qualified immunity from liability for damages.

I note that Plaintiffs fail to cite one case that would support a money judgment against Defendants. While I realize that strict factual identity among cases is not required, *Lappe v. Loeffelholz,* 815 F.2d 1173, 1177 (8th Cir.1987), in order for Plaintiffs to recover money there must be some compelling precedent that would have made it clear to the prison officials that what they were doing violated federal law. This is particularly true where, as here, the dispute is in the "mechanics" of how the prisoners are allowed to practice their religion, as opposed to a total ban on the exercise of the prisoners' religious rights. The "unconstitutionality of the conduct must be apparent from pre-existing law." *Reutcke v. Dahm,* 707 F.Supp. 1121, 1135 (D.Neb.1988) Plaintiffs have cited no such law.

6. The Act became law November 16, 1993.

In summary, the motion for summary judgment will be granted in part, providing that Defendants shall have immunity from damages under the Eleventh Amendment and the doctrine of qualified immunity. Of course, the suit will still proceed on the request for declaratory and injunctive relief.

Accordingly,

IT IS ORDERED that motion for summary judgment (filing 65):

(1) is denied, without prejudice, on the merits;

(2) is granted to the extent that the Defendants shall have immunity from liability for damages.

Pub.L. 103–141 §§ 1–7, 107 Stat. 1488–89.