STATE of Wisconsin, Plaintiff-Respondent,†

v.

Emanuel D. MILLER, Enos S. Hershberger, David E. Yoder, Eli M. Zook, Eli E. Swartzentruber, Eli J. Zook, Levi E. Yoder, and Jacob J. D. Hershberger, Defendants-Appellants.

Court of Appeals

*No. 94–0159. Submitted on briefs June 13, 1995.—Decided August 3, 1995.*

(Also reported in 538 N.W.2d 573.)

†Petition to review granted.

239

240

For the defendants-appellants the cause was submitted on the brief of *Kristina E. Williamson* of *Williamson & Taylor* of Roseville, Minnesota, *Philip G. Villaume* and *Kyle D. White* of *Philip G. Villaume & Associates* of Bloomington, Minnesota and *Kenneth D. Nelson* of Apple Valley, Minnesota.

For the plaintiff-respondent the cause was submitted on the briefs of *Richard R. Lewis*, assistant district attorney of Neillsville, and *James E. Doyle*, attorney general and *Maureen McGlynn Flanagan*, assistant attorney general.

Before Eich, C.J., Dykman and Sundby, JJ.

DYKMAN, J.   Emanuel D. Miller, Enos S. Hershberger, David E. Yoder, Eli M. Zook, Eli E. Swartzentruber, Eli J. Zook, Levi E. Yoder and Jacob J.D. Hershberger (hereinafter "appellants") are mem-

bers of the Old Order Amish faith. They appeal from an order directing them to pay a forfeiture for their failure to display a red and orange triangular slow-moving vehicle (SMV) emblem on their horse-drawn buggies as required by § 347.245, STATS.[1] The appellants argue that the SMV statute violates their rights to free exercise of religion guaranteed by the First Amendment to the United States Constitution[2] and Article I, § 18 of the Wisconsin Constitution[3] because the State has not demonstrated that requiring a SMV emblem is the least restrictive alternative that might be used to further its interest in traffic safety. We agree and therefore reverse.

---

[1] Section 347.245(1), STATS., provides in part:

[N]o person may operate on a highway, day or night, any . . . animal-drawn vehicle . . . that usually travel[s] at speeds less then 25 miles per hour or any vehicle operated under a special restricted operator's license issued under s. 343.135, unless there is displayed on the most practicable visible rear area of the vehicle or combination of vehicles, a slow moving vehicle (SMV) emblem as described in and displayed as provided in sub. (2).

[2] The First Amendment to the United States Constitution provides in part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

[3] Article I, § 18 of the Wisconsin Constitution provides:

The right of every person to worship Almighty God according to the dictates of conscience shall never be infringed; nor shall any person be compelled to attend, erect or support any place of worship, or to maintain any ministry, without consent; nor shall any control of, or interference with, the rights of conscience be permitted, or any preference be given by law to any religious establishments or modes of worship; nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries.

## BACKGROUND

The appellants were issued citations for driving their horse-drawn buggies on public roads without displaying a SMV emblem. Horse-drawn buggy transportation is an important part of Amish life. The Ordnung[4] of the local Amish church district prohibits the use of the SMV emblem and directs the appellants to instead use white reflective tape and a lantern at night and during inclement weather. The Ordnung also requires the appellants to drive on the shoulder of the highway whenever possible. Failure to comply with the Ordnung is considered a sin and may result in shunning or excommunication.

The appellants object to the SMV emblem on three grounds. First, they contend that the emblem's fluorescent red and orange colors are too "loud and bright." Second, they contend that the emblem is a "worldly symbol" that prevents them from maintaining their strict adherence to nonconformity and separateness from the world. Third, they contend that they are unwilling to put their faith in a human symbol as opposed to God.

The trial court determined that the State met its burden of demonstrating that its interest in traffic safety could not be met by the proposed alternative of white reflective tape combined with a lantern. In so doing, the court focused on the State's evidence stressing the need for universal recognition which the SMV emblem provides. Accordingly, the court rejected the appellants' constitutional claims and enforced the citations against them. This appeal followed.

---

[4] Ordnung is the Amish term for the church's rules and regulations which guide Amish life.

## STANDARD OF REVIEW

Before reaching the merits of this appeal, we must first determine the appropriate test for deciding whether the SMV statute, as applied to the appellants, violates their right to free exercise of religion guaranteed by the Wisconsin and United States Constitutions. Most recently, the Wisconsin Supreme Court indicated that Article I, § 18 of the Wisconsin Constitution is the equivalent of the Establishment and Free Exercise Clauses of the First Amendment to the United States Constitution. *King v. Village of Waunakee*, 185 Wis. 2d 25, 52, 517 N.W.2d 671, 682 (1994). Older Wisconsin Supreme Court cases had concluded that Article I, § 18 provided a greater degree of protection of religious liberty than the First Amendment. *See, e.g., State ex rel. Reynolds v. Nusbaum*, 17 Wis. 2d 148, 165, 115 N.W.2d 761, 769-70 (1962). In *King*, however, the supreme court suggested that even though the language of both the federal and state constitutions differ, both serve the same dual purpose of prohibiting the establishment of religion by the state and protecting a person's free exercise of it. *King*, 185 Wis. 2d at 54-55, 517 N.W.2d at 683-84. Consequently, the court concluded that it must interpret and apply Article I, § 18 in light of United States Supreme Court cases interpreting the Establishment Clause in the First Amendment. *Id.* While *King* is an Establishment Clause and not a Free Exercise Clause case, we do not believe that it is distinguishable on that basis alone. *King* suggests that the analysis of a free exercise of religion claim is the same under federal and state constitutional law. Accordingly, we conclude that *King* requires that we construe Article I, § 18 in the same manner as the Free Exercise Clause of the First Amendment.

245

Until 1990, the United States Supreme Court subjected laws that burdened the free exercise of religion to the strictest level of scrutiny under which such laws had to be narrowly tailored to serve a compelling state interest. *See, e.g., Wisconsin v. Yoder*, 406 U.S. 205 (1972); and *Sherbert v. Verner*, 374 U.S. 398 (1963). However, this test was abandoned in *Employment Div., Dep't of Human Resources v. Smith*, 494 U.S. 872 (1990), where the Court determined that a law that burdens religious practices need not be justified by a compelling governmental interest if it is neutral and of general applicability.

Congress responded to *Smith* with the passage of the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. §§ 2000bb to bb-4, which restores the compelling state interest test set forth in *Sherbert* and *Yoder* for controversies involving laws that substantially burden a person's religious practices. The purpose of RFRA is to guarantee the application of the compelling state interest test in all cases where the free exercise of religion is substantially burdened and to provide a statutory claim or defense to persons whose religious exercise is substantially burdened by the government. 42 U.S.C. § 2000bb(b). RFRA provides in pertinent part:

> (a) **In general**. Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).

> (b) **Exception**. Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

> (1) is in furtherance of a compelling governmental interest; and

> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb-1.

The State argues that RFRA is not applicable to this case for two reasons: (1) the appellants failed to plead it before the trial court and therefore it is not reviewable for the first time before this court; and (2) RFRA is unconstitutional. We disagree.

■

First, by its own terms, RFRA applies to *all* federal and state laws *and the implementation of those laws* whether adopted before or after its enactment. 42 U.S.C. § 2000bb-3(a). By use of the word "implementation," Congress clearly intended that RFRA apply to all laws and all acts enforcing those laws which occurred prior to its enactment. *Bessard v. California Community Colleges*, 867 F. Supp. 1454, 1459 (E.D. Cal. 1994); *Hunt v. Hunt*, 648 A.2d 843, 850 (Vt. 1994). As the court noted in *Bessard*, 867 F. Supp. at 1459, "[e]very published federal decision to consider the issue holds RFRA completely retroactive." Thus, the appellants are under no obligation to plead this defense. Consequently, we conclude that the application of RFRA to the instant case is appropriate and consistent with congressional intent.

■

Second, Congress expressly overruled *Smith* with the passage of RFRA and the reestablishment of the compelling state interest test for cases involving the implication of a person's free exercise of religion rights. Thus, our resolution of this case rests on a constitutional as well as a statutory basis. At least two courts

deciding this issue have already determined that RFRA is constitutional pursuant to Congress's enforcement powers under § 5 of the Fourteenth Amendment to the United States Constitution. *See Sasnett v. DOC*, 891 F. Supp. 1305, 1315-21 (W.D. Wis. 1995); *Belgard v. Hawaii*, 883 F. Supp. 510, 512-17 (D. Haw. 1995). *But see Flores v. City of Boerne*, 877 F. Supp. 355, 357 (W.D. Tex. 1995) (finding RFRA unconstitutional because it violates the separation of powers doctrine). Section 5 of the Fourteenth Amendment provides that Congress shall have the power to enforce by appropriate legislation the provisions contained in the Fourteenth Amendment. This enforcement power has been extended to earlier Amendments. *Belgard*, 883 F. Supp. at 515-16. We agree with the analyses set forth in *Belgard* and *Sasnett* and conclude that RFRA violates no federal constitutional principles. Accordingly, we will apply the compelling state interest test to the instant case.

## SMV STATUTE

To determine whether the SMV statute, § 347.245, STATS., is unconstitutional as applied to the appellants, we must first examine whether the appellants have demonstrated that they have sincerely held religious beliefs which are burdened by the application of the SMV statute. The burden then shifts to the State to demonstrate that the SMV statute furthers a compelling state interest and is the least restrictive means of furthering that interest. 42 U.S.C. § 2000bb-1(b).

There is no question but that the appellants have sincerely held religious beliefs which are burdened by the SMV statute. The appellants presented testimony

248

showing that they object to the use of a symbol and the red and orange colors because a basic tenet of their faith is to remain separate from the world. The local Ordnung prohibits the appellants from using the SMV emblem and their compliance with it would be regarded a sin. Consequently, the SMV statute burdens the appellants.[5]

The State argues, and the appellants agree, that the State has a compelling interest in traffic safety. A compelling interest encompasses "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Yoder,* 406 U.S. at 215. In other words, "[a] compelling interest is not just a general interest in the subject matter but the need to apply the regulation without exception to attain the purposes and objectives of the legislation." *State v. Yoder,* 49 Wis. 2d 430, 438, 182 N.W.2d 539, 542 (1971), *aff'd sub. nom. Wisconsin v. Yoder,* 406 U.S. 205 (1972). The primary purpose of the SMV statute is to ensure traffic safety which is achieved through uniformity, regularity, and predictability in the signs designating slow-moving vehicles on the public roads. Public safety and the protection of human life is a state interest of the highest order.

The existence, however, of a compelling state interest does not mean that no constitutional violation has occurred. To survive strict scrutiny, the State must also show that the SMV statute is narrowly tailored. In other words, the State must show that the SMV statute

---

[5] The State questions the sincerity of the appellants' religious beliefs, pointing to evidence that some members of the Amish faith use the SMV emblem. The test, however, is to examine the sincerity of the appellants' beliefs and not what others in similar religious communities might believe.

is the least restrictive alternative. Upon our review of the evidence, we are convinced that the State has not met this burden.

Two experts testified on behalf of the State as to the importance of uniformity for traffic safety. They stressed that drivers recognize red and orange colors as signifying stopping or warning and that the triangular shape is significant for color blind persons. The experts explained that the same shape and colors are used throughout the United States and that no other sign has the same shape or colors in Wisconsin. The experts stated that drivers must not only be able to see a vehicle, but must be able to immediately recognize that vehicle as slow moving. The SMV emblem achieves this goal because it is universally recognizable. The experts testified that the appellants' alternative would be helpful for viewing the vehicle, and while white reflective tape is superior to red for identification, the tape would not warn drivers that the vehicle is slow moving. The State, however, failed to offer evidence comparing the effectiveness of the SMV emblem with the alternative proposed by the appellants. In fact, one expert testified that he had not completed this type of testing.

Additionally, four Clark County residents testified that they had almost hit horse-drawn buggies. However, none of the buggies involved in the near-misses were using the appellants' alternative.

The appellants' expert, Jack Anderson, testified that not all drivers understand that the SMV emblem denotes a slow-moving vehicle and noted that the triangular shape is also used as a warning for stalled trucks. He also explained that white reflects light four to five times more than red and that the brighter an object is, the easier it is to see. He opined that a buggy using white reflective tape is "a lot safer" than one

using the SMV emblem "because it can be seen earlier, more easily, and [in] different conditions." Thus, he concluded that the appellants' alternative met the State's safety concerns.

In *State v. Hershberger*, 462 N.W.2d 393, 397-99 (Minn. 1990) (*Hershberger II*), the court determined that the Minnesota SMV statute, as applied to the Amish, violated the Minnesota Constitution. The court applied the compelling state interest test and concluded that the State failed to meet its burden of showing that its interest in public safety could not be achieved through the Amish alternative of using white reflective tape with a red lantern. *Id.* at 399. Indeed, the proof offered by the State in that case was virtually identical to that in our case. While experts testified that the SMV emblem was almost universally recognized as designating a slow-moving vehicle and county residents testified about their near-miss incidents involving Amish buggies, *id.* at 395 (citing *State v. Hershberger*, 444 N.W.2d 282, 288 (Minn. 1989) (*Hershberger I*), *vacated*, 495 U.S. 901 (1990)), the State, however, failed to present evidence of accident incidence involving vehicles displaying the SMV emblem as contrasted with those not displaying it. *Id.* at 399. Thus, the court concluded that the State failed to meet its burden of proof. *Id.*

Similarly, in *People v. Swartzentruber*, 429 N.W.2d 225, 228-29 (Mich. Ct. App. 1988), the court also determined, using the compelling state interest test, that the Michigan SMV statute, as applied to the Amish, violated their free exercise of religion rights because the State failed to demonstrate that the use of the SMV emblem resulted in fewer accidents as compared with those buggies not displaying it. In that case, the State also failed to present evidence demonstrating that the

white reflective tape and red lantern alternative was any less safe than the SMV emblem. *Id.*

Like *Hershberger II* and *Swartzentruber*, we conclude that the State has not met its burden in this case by its failure to present evidence comparing the incidence of accidents involving buggies using the SMV emblem with those which do not. Notwithstanding the State's interest in uniformity, the appellants have proffered evidence demonstrating that their alternative is one that is accepted in other jurisdictions as a means of warning other drivers that the appellants are driving a slow-moving vehicle. Uniformity is important to traffic safety, nevertheless, uniformity should not infringe upon an individual's religious rights when the State's interests may be met by another means. Absent evidence regarding accident incidence, we will not accept the State's contention that the SMV emblem is the only means of avoiding buggy accidents. The main purpose of the SMV emblem is to prevent accidents by aiding other drivers in identifying that another vehicle is present. The appellants' alternative has the same effect. When fundamental constitutional rights are implicated, the State's rules must be narrowly tailored to the interest it seeks to further. In this case, the State has not demonstrated that the SMV emblem is the least restrictive means of furthering its interest in traffic safety. Accordingly, we reverse the trial court's order and remand with instructions that the citations be dismissed.

*By the Court.*—Order reversed and cause remanded with directions.

SUNDBY, J. (*dissenting* ). I do not accept that Congress may compel the United States Supreme Court to interpret the Free Exercise Clause of the First Amendment as Congress believes it should be interpreted. Therefore, I conclude that the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. §§ 2000bb to 2000bb-4, is no more than a federal statute. I believe we remain bound by the interpretation of the Free Exercise Clause announced by the Supreme Court in *Employment Div., Dep't of Human Resources v. Smith*, 494 U.S. 872 (1990). I therefore dissent.

Prior to *Smith*, the Supreme Court appeared to require a special showing when a law of general applicability interfered with the free exercise of an individual's religion. David M. Smolin, *The Free Exercise Clause, the Religious Freedom Restoration Act, and the Right to Active and Passive Euthanasia*, 10 ISSUES IN LAW & MEDICINE 3, 18 (1994-95). Thus, a law of general applicability governed all citizens, regardless of their religion, subject to certain exceptions. *Id.* To determine whether an exception was required, the Court applied a three-part test. *Id.* First, the Court would determine whether the individual had a sincerely-held religious belief. *Id.* (citing *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 713-16 (1981); *Wisconsin v. Yoder*, 406 U.S. 205, 215-16 (1972)). Second, the Court determined whether the law of general applicability substantially "burdened" a sincerely-held religious belief. *Id.* at 18-19 (citing *Thomas*, 450 U.S. at 717-18; *Yoder*, 406 U.S. at 217-20). Finally, if the individual showed the requisite burden on a sincerely-held religious belief, the government had to grant him or her an exemption from the law unless the government could show it had a countervailing "compelling interest." *Id.* at 19.

The Supreme Court generally interpreted the compelling interest test as requiring a balancing of the state's interests with the burden on the individual's free exercise of religion. 10 ISSUES IN LAW & MEDICINE at 19. Under the compelling interest test, the Supreme Court ruled against a variety of litigants. *Id.*

*Smith* upheld the application of Oregon's criminal statute to respondents' sacramental use of peyote as members of the Native American Church. 494 U.S. at 890. The majority refused to apply the compelling interest test and gave a number of reasons for rejecting the test. The author of the majority opinion, Justice Scalia, interpreted prior cases as requiring that the compelling interest test be applied in cases involving "hybrid" rights. 10 ISSUES IN LAW & MEDICINE at 23 (citing *Smith*, 494 U.S. at 881-82). Thus, *Wisconsin v. Yoder* which involved the Free Exercise Clause *and* substantive due process rights of Amish parents was reaffirmed.

This narrowing of the compelling interest test was greeted with horror by many academics, religious freedom litigators, and organizations concerned with religious freedom. 10 ISSUES IN LAW & MEDICINE at 36. Because of the number of institutions and organizations concerned in cases and debates concerning the Free Exercise Clause, there was a built-in response to *Smith* which resulted in the enactment of RFRA, introduced as S. 3254 and H.R. 5377 in the 101st Congress. *Id.* Congress stated that the purpose of RFRA was to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963), and *Wisconsin v. Yoder*. 42 U.S.C. § 2000bb(b)(1). The "least restrictive means" test[1] is arguably a more stringent test than has

---

[1] RFRA provides in part:

ever been employed by the Supreme Court. 10 ISSUES IN LAW & MEDICINE at 37. Thus, RFRA may be viewed as not merely restoring the compelling interest test but creating a new, and more restrictive, test. Professor Smolin suggests that RFRA could be construed in at least four ways. *Id.* at 38-39. He suggests that, "[t]he strained nature of the claim that the 'least restrictive means' test is a mere restoration creates ambiguity as to the standard of review actually created by RFRA." *Id.* at 38. Thus, even if we consider that we are bound by the interpretation of the Free Exercise Clause imposed by Congress, we would have to resolve these ambiguities before we can decide this case.

Several federal courts and at least one state court have addressed RFRA, sometimes in "hybrid" cases brought pursuant to 42 U.S.C. § 1983. In *Sasnett v. DOC*, 891 F. Supp. 1305 (W.D. Wis. 1995), District Judge Crabb ruled that § 5 of the Fourteenth Amendment gave Congress the power to pass legislation protecting the free exercise of religion to a greater degree than the Supreme Court is willing to read into the Free Exercise Clause. Section 5 provides that "Congress shall have power to *enforce*, by appropriate legislation, the provisions of this article." (Emphasis added.) This construction gives the word "enforce" a

---

(a) **In general.** Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).

(b) **Exception.** Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling governmental interest; and
(2) is the *least restrictive means* of furthering that compelling governmental interest.

42 U.S.C. § 2000bb-1 (emphasis added).

very strained reach. Section 1983 is "appropriate legislation" to enforce the Bill of Rights. However, that statute does not attempt to force any court to construe a Bill of Rights' amendment in a way acceptable to Congress.

Judge Crabb also addressed what I believe is the crucial infirmity of RFRA; it violates the principle of federalism embodied in the Tenth and Eleventh Amendments. Judge Crabb concluded that RFRA did not "mandate judicial invasion into any core areas of traditional state prerogative." *Sasnett*, 891 F. Supp. at 1320. Judge Crabb suggested that the states were free under the Act to narrowly tailor their actions to further a compelling state interest. *Id.* at 1320-21. In her view, Congress may impose upon the state courts a construction of the Bill of Rights' amendments which Congress favors. I do not agree that RFRA or any other act which has this effect "places only a reasonable burden on state autonomy." *Id.* at 1321. One need not exhaustively examine the debates of the constitutional convention to conclude that the rights of the states against the central government were zealously protected by the framers of the Constitution and the supporters of a federal Bill of Rights. I suggest that adoption of the Fourteenth Amendment by the federal Congress would have been strongly opposed by the states had it been understood that § 5 of that amendment gave to Congress the power to compel state courts to interpret the Bill of Rights' amendments according to congressional philosophy.

The holdings of other courts are mixed. In *Belgard v. Hawaii*, 883 F. Supp. 510, 513 (D. Haw. 1995), the court took the novel approach that in enacting RFRA, Congress did not prescribe a decisional rule as to the interpretation of a constitutional provision but, rather,

sought to protect free exercise rights to an extent greater than the Supreme Court required. Perhaps Congress can achieve such a result by enacting a federal statute, but it cannot require the Supreme Court to interpret the Free Exercise Clause to be congruent with Congress's construction of that clause.

In *Hunt v. Hunt*, 648 A.2d 843, 850 n.4 (Vt. 1994), the court expressed no opinion as to the constitutionality of RFRA.

In *Francis v. Keane*, 888 F. Supp. 568 (S.D.N.Y. 1995), the court held that RFRA provides a *statutory* claim or defense to persons whose religious exercises are substantially burdened by the government. *Id.* at 572. The court concluded that the defendant correctional officials were not entitled to summary judgment on the plaintiff correctional employees' RFRA *statutory* claims. *Id.* at 576. As to the employees' free exercise claim under the New York state constitution, the court concluded that the defendants could not succeed, at summary judgment, whether the court applied a compelling state interest test or a balancing test. *Id.* at 579. The court, in a comprehensive footnote, analyzed the treatment that courts have given to RFRA. The court pointed out that some courts apply the compelling governmental interest test articulated in RFRA to claims brought under the First Amendment. *Id.* at 572 n.5. Other courts have treated RFRA as a statutory enactment and not an interpretation of the First Amendment. *See id.*

I conclude that we may give weight to the intent of Congress in RFRA but the Act is not applicable in our decision-making processes either as a statute or an interpretation of the Free Exercise Clause. I would therefore consider that we are bound by the interpreta-

tions of the United States Supreme Court and not RFRA.